**\*\* NOT FOR PUBLICATION \*\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————— :    Civil Action No. 15-3719 (FLW)
JAMES PUCCIARELLO, III,                     :
                                            :         **OPINION**
                        Plaintiff,          :
                                            :
        v.                                  :
                                            :
CAROLYN W. COLVIN,                          :
Acting Commissioner of Social Security,     :
                                            :
                        Defendant.          :
———————————————————— :

**WOLFSON, United States District Judge**:

James Pucciarello, III ("Pucciarello" or "Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security, Carolyn W. Covlin ("Defendant") denying Plaintiff disability benefits and supplemental security income under Title II and XVI of the Social Security Act (the "Act"). After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") opinion was based on substantial evidence and, accordingly, affirms the decision.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on August 12, 1966, and was 45 years old on the alleged disability onset date of September 26, 2011.[1]  *See* Administrative Record 29, 228-30 (hereinafter "A.R.").  Plaintiff has a high school education, and attended a trade school to study electronics.  A.R. 29-30.  Prior

---

[1] Plaintiff's applications for benefits and supplement income originally claimed a disability onset date of August 18, 2008, which was later amended on oral motion by the Plaintiff.  A.R. 28-29.

to his alleged disability, Plaintiff worked in various positions in newspaper delivery, collections, insert control, and as a messenger.  A.R. 31-33.

On January 24, 2011, Plaintiff applied for social security disability insurance benefits, alleging disability beginning on August 18, 2008, complaining of debilitating back and leg pain. *See* A.R. 229.  On February 8, 2011, Plaintiff applied for supplemental security income, also alleging disability beginning on August 18, 2008.  A.R. 233.  Plaintiff's claims were denied on June 8, 2011, A.R. 135-40, and again upon reconsideration on January 10, 2012.  A.R. 143-48. On February 21, 2012, Plaintiff requested a hearing, A.R. 149, which was held on February 12, 2013, before ALJ Elias Feuer.  A.R. 25-65.

On March 26, 2013, the ALJ wrote to Vocational Expert ("VE") Jackie L. Wilson to "request[] [her] professional opinion," and enclosed a Vocational Interrogatory, which included four hypotheticals.  A.R. 321, 332-42.  On April 15, 2013, the ALJ completed the Vocational Interrogatory and provided the answers to the four hypotheticals posed, which the Court will discuss in more detail below.  A.R. 332-42.

By letter dated April 17, 2013, the ALJ provided Plaintiff's counsel with the VE's Vocational Interrogatory responses and notified him of his right to request a supplemental hearing. A.R. 343-44.  By letter dated April 29, 2013, Plaintiff requested a supplemental hearing.  A.R. 346.

The supplemental hearing was held on August 27, 2013.   A.R. 66-88.  By letter dated September 16, 2013, Plaintiff's counsel provided the ALJ with additional evidence in the form of "statistical information of the labor force in the New York-Northern New Jersey Metropolitan area" published by the U.S. Bureau of Labor Statistics.  A.R. 360-61, 248-59.  In that letter, Plaintiff asserted that "the record fails to demonstrate work claimant could perform in significant

numbers despite his severe impairment" because the amount of available jobs is "infinitesimal" given the large amount of all jobs in the regional and national economy.  A.R. 360-61.

On December 26, 2013, the ALJ issued a written decision which determined that Plaintiff was not disabled and denied his claims for disability insurance benefits. A.R. 13-24.  Plaintiff requested review by the Appeals Council, which was denied on April 7, 2015.  A.R. 1-6.  On June 3, 2015, Plaintiff filed the instant appeal.

### A.    Review of the Medical Evidence

On August 18, 2008, Plaintiff slipped on a wet floor at work and fell down 7-8 steps, injuring his lower back.  A.R. 431.   On August 19, 2008, Plaintiff went to the emergency room at Somerset Medical Center, where he complained of pain radiating down his right leg.  A.R. 431-32.   On that same date, Anthony Caravello, D.O., performed an MRI on Plaintiff's lumbar spine, which showed "[n]o acute osseous lumbar spine abnormality or significant degenerative change." A.R. 389-90.

On September 8, 2008, Kristin Lupoli, M.D., performed an MRI of Plaintiff's lumbar spine, which showed a "[p]resumed right T10/11 nerve root sleeve cyst" and "Degenerative disk cartilages at L4-5 and L5-S1 with mild diffuse bulges of both of the disk cartilages.  Evidence of disk herniation is not present."  A.R. 391.   The MRI also showed no evidence of spinal canal stenosis.  A.R. 391.

Plaintiff was treated for his low back pain at Priority Medical Care on August 29, 2008; September 3, 10, and 24, 2008; and October 15, 2008.  A.R. 384-88.  Plaintiff received physical therapy from Tom Greene, MPT, at Somerville Physical Therapy on October 13, 2008.  A.R. 392-95.

On October 24, 2008, Plaintiff was examined by James W. Dwyer, M.D., who observed that Plaintiff's lumbar flexion was diminished by 50% and painful, his lumbar extension was minimally restricted, and that his straight leg raises were positive on the right side at approximately 60 degrees. A.R. 441-42. Dr. Dwyer diagnosed Plaintiff with an annular tear at L4-L5 and L5-S1 with degenerative disc disease. A.R. 442. Dr. Dwyer prescribed further physical therapy and anti-inflammatories to treat plaintiff's lumbar symptoms. A.R. 442.

On November 14, 2008, Dr. Dwyer examined Plaintiff in a follow-up visit. A.R. 485. Dr. Dwyer noted that Plaintiff was "[d]oing well with physical therapy" and that it had "helped him significantly." A.R. 485. Plaintiff had not had an epidural injection because "he now feels approximately 70% improved from his previous condition. No radicular pain. Leg pain has resolved." A.R. 485. Dr. Dwyer observed that Plaintiff "can straight leg raise to 90 degree bilaterally. Flexion and extension are minimally restricted with mild pain at end-range extension. No sensory or motor deficits. No motor weaknesses." A.R. 485. Dr. Dwyer concluded that Plaintiff should continue with physical therapy and start a work conditioning program, and that if light duty were available in two-to-three weeks, he "would certainly clear [Plaintiff] for return to work at 40 hours a week with a 25-pound lifting limit." A.R. 485.

On December 5, 2008, Dr. Dwyer noted that Plaintiff reported that he "overdid it with the work condition program, had a setback, but now the pain has settled down. He has much stiffness in his back, especially in the morning. Occasional discomfort into his right leg. Basically, at this point, his pain is minimal." A.R. 486. Dr. Dwyer observed that Plaintiff had "tenderness over the midline at the S1 spinous process. No paravertebral spasm or tenderness. Flexion and extension are limited by about 50%." A.R. 486. Dr. Dwyer again concluded that he would clear Plaintiff for work at light duty, but that no light duty work appeared to be currently available. A.R.

4

486.  Dr. Dwyer did not recommend surgery or an epidural injection due to Plaintiff's minimal pain.  A.R.  486.

On December 22, 2008, Dr. Dwyer examined Plaintiff again, who reported that his pain was a 5 on a 0-10 scale.  Dr. Dwyer recommended Plaintiff undergo an epidural injection.  A.R. 446-47.

On January 23, 2009, Dr. Dwyer examined Plaintiff again.  Dr. Dwyer noted that Plaintiff was "feeling much better since physical therapy. . . [b]asically, his pain level is 0, [and] he feels it is improving.  He states that since he stopped therapy, his pain seems to be greatly improved." A.R. 408.  Dr. Dwyer observed that Plaintiff have "no tenderness to palpation.  No paravertebral spasm.  Flexion and extension unrestricted.  Straight leg raising is 90 degrees." A.R. 408.  Dr. Dwyer recommended that Plaintiff undergo a Functional Capacity Evaluation.  A.R. 408.

On February 16, 2009, Dr. Dwyer examined Plaintiff again.  A.R. 449.  Plaintiff reported he "feels he significantly improved."  As Dr. Dwyer reported:  "He states his 'back feels better." He has recently passed a functional capacity evaluation that puts him at the ability to perform heavy-duty work.  His job description is only that of medium duty."  A.R. 449.  Dr. Dwyer observed that Plaintiff "has no tenderness to palpation or paravertebral spasm.  His lumber spinal motion is good," and released Plaintiff to work at regular duty.  A.R. 449.

On May 5, 2011, Marc Weber, M.D., performed a consultative examination of Plaintiff at the request of the State agency.  A.R. 475-78.  At that exam, Plaintiff complained of ongoing low back pain since his fall in 2008, as well as numbness and tingling in the right leg, which he alleged sometimes "gave out" on him.  A.R. 475.  Plaintiff stated that he could only sit or stand for approximately 15 minutes at a time.  A.R. 475.  Plaintiff stated that he lived with his mother, ambulated with the use of a straight cane (which was not prescribed), and was independent in

activities of daily living.  A.R. 475, 478.  Dr. Weber noted that Plaintiff appeared uncomfortable during the examination, but was in no apparent distress.  A.R. 476.  Plaintiff had tenderness on palpation of his mid-lumbar paraspinal muscles on the right, as well as his mid-lumbar interspinous regions.  A.R. 476.  Dr. Weber also noted Plaintiff had muscle spasms, no muscle atrophy was present in his lower extremities, and his muscle strength was 5/5 in his upper extremities, including his grip strength and pinch strength.  A.R. 476.  Plaintiff had 4+/5 muscle strength in hip flexion and knee extension and 5/5 muscle strength in his bilateral ankle dorsiflexion and plantar flexion.  A.R. 492.  Plaintiff's sensation was intact to light touch and pinprick in all four extremities.  A.R. 476.  Plaintiff's deep tendon reflexes were 2+ in both his upper and lower extremities.  A.R. 476.  His range of motion of his cervical spine was normal, and his range of motion of his shoulders was 0 to 90 degrees flexion, as it induced back pain.  A.R. 476.  Dr. Weber noted that Plaintiff's lumbar spine flexion was 30 degrees, extension 10 degrees, and lateral bending 5 degrees to the right and to the left.  A.R. 476.  The range of motion of Plaintiff's lower extremities was within functional limits.  A.R. 476.  Plaintiff's straight leg raising was positive on the right side at 10 degrees and positive on the left side at 30 degrees in the supine position.  A.R. 476.  Dr. Weber observed that Plaintiff was able to fully extend his hands, make fists, and oppose his fingers, separate papers, and lift a pen off the table.   A.R. 476.  Plaintiff was not able to stand on his heels or his toes, nor could he perform a squat.  A.R. 476.  Plaintiff  independently ascended and descended the examination table, and removed and put on his shoes.  A.R. 476.  Plaintiff ambulated with an antalgic gait.  A.R. 476.  Dr. Weber's impression was that Plaintiff was a 44-year-old individual with chronic low back pain and a history of lumbar degenerative disc disease.  A.R. 476.

On May 16, 2011, Robert Walsh, M.D., a State agency medical consultant, reviewed the record at the initial level of review, and opined that Plaintiff was capable of performing a wide range of sedentary work.  A.R. 95-97.

On October 24, 2011, Dr. Dwyer examined Plaintiff again.[2]   Plaintiff reported that he had "[s]ignificant severe lower back pain, rated 8 on the 0 to 10 scale with pain that radiates to both lower extremities, right-sided greater than left and giving way of his right leg.  Pain with sitting, standing, and walking.  Difficulty with stepping.  Occasional giving way of the leg."  A.R. 481.  Dr. Dwyer observed that Plaintiff had tenderness over the L4 and L5 spinous processes.  Bilateral spasm and tenderness.  Flexion diminished by 50% slightly antalgic gait.  Give way and loss of strength of his right EHL."  A.R. 481.  Dr. Dwyer reviewed a new MRI of Plaintiff's lumbar spine[3] and noted that it showed "desiccation at the L4-L5 and L5-S1 discs.  More central protrusion at L5-S1 and facet edema at L4-L5 bilaterally, perhaps a small annular tear [at] the L4-L5 level as well."  A.R. 481.  Dr. Dwyer diagnosed Plaintiff with "1. Painful disc disruption.  2. Annular tear.  3. Herniated nucleus pulposus of lumbar spine, L4-L5 and L5-S1. [and] 4. Facet Sprain, L4-L5."  A.R. 481.   Dr. Dwyer explained that Plaintiff has "failed with physical therapy" and that he "has never had any improvement with the epidural injections," and recommended surgical treatment "involving a transforaminal lumbar interbody fusion at the L4-L5 and L5-S1 levels," contingent

---

[2] The Court notes that this is the first medical record dated after the alleged onset date of September 26, 2011.

[3] The independent report from Regional Independent Medical Evaluations states that this MRI was performed on October 18, 2011, which was ordered by Dr. Dwyer at an examination on September 16, 2011.  A.R. 502-03.  However, there is no record of Dr. Dwyer's September 16, 2011 examination in the medical record.  Further, I note that Plaintiff represented at the initial hearing that the basis for amending his alleged onset date to September 26, 2011, ten days later, was because "[t]hat's when he was returned to Dr. Dwyer of Somerset Orthopedic Associates, who did further work up on him."  A.R. 28.

upon "confirm[ing] his pain generators with discography."[4]   A.R. 481.   Dr. Dwyer noted that Plaintiff needed to stop smoking before any surgical treatment and referred him to a pain management specialist for interim treatment pending the discography and Plaintiff's cessation of smoking.   A.R. 481.

On January 2012, Arthur Pirone, M.D., a State agency medical consultant, reviewed the updated medical evidence at the reconsideration level, and reaffirmed the previous RFC finding that Plaintiff was capable of performing a wide range of sedentary work.   A.R. 115-18. Additionally, Ellen Gara, Psy.D., a State agency psychological consultant, reviewed the record and opined that Plaintiff did not have a medically determinable psychological impairment.   A.R. 116.   Dr. Gara noted that there was no evidence that Plaintiff was treated by any provider for depression or any other mental impairment.   A.R. 115-16.

On May 7, 2012, at the request of his attorney, Plaintiff underwent an examination at Regional Independent Medical Evaluations.[5]   *See* A.R. 502-07.   Plaintiff complained of lumbar spine pain and stiffness that waxed and waned.   A.R. 503.   Plaintiff also complained of radicular pain involving his bilateral lower extremities, right greater than left.   A.R. 503.   Plaintiff stated that he was taking Tylenol #4.   A.R. 504.   Plaintiff claimed that he could only sit comfortably for 15 minutes in an hour, stand comfortably for 15 minutes in an hour, and that he had difficulty walking greater than half a block and climbing stairs.   A.R. 503.   Plaintiff also claimed difficulty with going from a seated to standing position and that repetitive bending, twisting, and lifting

---

[4] The independent report from Regional Independent Medical Evaluations notes that Plaintiff claimed this discography was denied by his insurance company.   A.R. 503.

[5] The May 7, 2012 report is unsigned and not attributed to any specific physician.   Plaintiff states in his Brief that the examiner was Arthur Becan, M.D.   *See* Pl.'s Br. at 5.

exacerbated his pain.  A.R. 503.  Plaintiff stated that he could not lift weights greater than 20

pounds.  A.R. 503.  The report issued following the physical examination of Plaintiff notes:

> The claimant ambulates with a markedly guarded gait pattern.  There is difficulty with toe walking on the right as compared to the left.
>
> Examination of the lumbar spine reveals posterior midline tenderness extending from L3 to S1.  There is bilateral paravertebral muscle spasm and tenderness extending from L2 to S1.  There is bilateral iliolumbar ligament tenderness and right sided sacroiliac joint tenderness, but not left sided tenderness.  Range of motion testing reveals forward flexion of 40/80 degrees, backward extension of 10/30 degrees, left lateral flexion of 20/30 degrees, right lateral flexion of 15/30 degrees, left rotation of 15/30 degrees, and right rotation of 20/30 degrees.  Extremes of motion cause low back pain.  Sitting root sign is to 70 degrees on the right; and 90 degrees on the left.  Straight leg raising in the supine position is to 50 degrees on the right and 80 degrees on the left.
>
> Manual muscle strength testing of the lower extremities reveals the quadriceps, hamstrings, gastrocenmius, and extensor hallucis longus muscles are graded at 5/5 bialterally.
>
> Sensory examination reveals a decreased sensation in the L5 nerve root distribution of the right lower leg as compared to the left.
>           . . . .
>
> Deep tendon reflexes reveals a decrease in the right ankle jerk reflex as compared to the left.

A.R. 504-05.  The report provided the following diagnoses:

> 1.     Chronic post-traumatic lumbosacral strain and sprain.
> 2.     Bulging L4-L5 and L5-S1 discs, confirmed by MRI.
> 3.     Lumbosacral radiculitis.
> 4.     Lumbosacral myofascitis.
> 5.     Herniated L5-S1 disc.
> 6.     Bulging L3-L4 disc.
> 7.     Right sided lumbrosacral radiculopathy.
> 8.     Status post interventional pain management with epidural steroid injections, lumbar spine.

A.R. 506.  This report recommended that Plaintiff undergo EMG/nerve conduction studies of his

lower extremities to determine the extent of his nerve root involvement, as well as a discogram of

Plaintiff's lumbar spine to determine the exact level of his pain generators.   A.R. 507.   The report

deferred assessing an impairment rating.   A.R. 507.

On February 1, 2013, pursuant to his workers' compensation claim, Plaintiff underwent an

independent medical examination by Patrick M. Foye, M.D.   A.R. 508-18.   Dr. Foye reviewed

Plaintiff's medical record history, including the MRI reports of his lumbar spine, taken in

September 2008 and October 2011, noting that there had not been a significant change in the MRI

reports. A.R. 508.  Plaintiff reported that his low back pain was exacerbated by prolonged sitting,

standing, and walking, and that he used a cane intermittently when he had to walk long distances

because of the weakness of his right leg.   A.R. 512-13.   Plaintiff reported that his pain was

alleviated with pain medications and rest.   A.R. 512.   Dr.  Foye noted that Plaintiff was taking

Tylenol #4 (one-half tablet daily), prescribed by a primary care physician, and that he had also

been taking Percocet.   A.R. 511, 513.   On examination, Plaintiff had low back pain with flexion

and extension of his lumbosacral spine.   A.R. 514.   He had diminished range of motion in all

directions, diffuse tenderness of his bilateral paraspinal muscles, sacroiliac joint pain, and an

antalgic gait. A.R.  514.    Plaintiff was not using an assistive device to walk.  A.R. 514.  Dr. Foye

noted that Plaintiff frequently stood up (two to three times) during the examination due to alleged

discomfort during sitting.   A.R. 514.   Plaintiff had mild difficulty with balancing while standing

and substantial difficulty with walking heel-to-toe.   A.R. 514.   There was no muscle atrophy in

either of Plaintiff's upper or lower extremities, but he had slightly decreased strength in the

muscles of his right lower extremity and normal strength in his left lower extremity.   A.R. 515.

Plaintiff's ankle jerk reflexes were brisk bilaterally and his knee jerk reflexes were normal at 2+.

A.R. 515.  Plaintiff's straight leg raise testing was indeterminate on the right and negative on the

left.  A.R. 515.  He had normal pinprick sensation in his upper extremities and decreased sensation

10

in his right lower extremity, suggesting decreased sensation in the right L4 and L5 dermatomes. A.R. 516.  Plaintiff had three out of five Waddell's signs for non-anatomic causes of low back pain, including an inconsistency between his seated and supine straight leg raising, generalized and non-anatomic tenderness to palpation of his lumbar spine, and overreaction or "exaggerated responses" to testing.  A.R.  516.

Dr.  Foye surmised that the "constellation of Plaintiff's symptoms suggests that there was a probable component of myofascial pain due to pain with flexion," as well a "possible component of discogenic pain due to pain with flexion and pain with sitting."  A.R. 516.  Dr. Foye noted that there was also some "suggestion of right lumbar radiculopathy" based on some weakness of Plaintiff's right lower leg muscles, but Dr. Foye stated that it was "difficult to discern whether there is true weakness as compared to strength inhibited by pain and/or motivation."  A.R. 516.  Dr. Foye also noted that the three out of five Waddell signs exhibited on examination made it further "difficult to interpret what was truly organic versus what was symptom magnification" by Plaintiff.  A.R. 516.  Dr. Foye recommended that Plaintiff undergo EMG and nerve conduction studies to objectively assess whether he had right lumbosacral radiculopathy and that if he did, he would potentially be a candidate for lumbosacral epidural steroid injection and other interventional treatments.  A.R. 517.

On November 25, 2013, Plaintiff was examined by Arthur Becan, M.D.[6]  A.R. 519-27.  Dr. Becan noted that Plaintiff claimed his level of pain was a 9 out 10 on a 0 to 10 scale, and recounted that Plaintiff complained of "radicular pain bilaterally, with numbness and tingling," which was

---

[6] Dr. Becan's November 25, 2013 medical report was not available to the ALJ, who issued his decision on December 26, 2013; Plaintiff submitted this report to the Appeals Council, which concluded that this additional evidence did not provide a basis for changing the ALJ's decision. A.R. 2, 105, 519-27.

exacerbated by coughing and/or sneezing and changes in the weather.  A.R. 520.  Dr. Becan also

noted that Plaintiff complained of the following difficulties with activities of daily living:

> [T]he claimant notes he can no longer perform his work as a courier.  He notes difficulty with his household chores of cooking, dishwashing, vacuuming, mowing the lawn, cleaning, laundry, and shopping.  He notes difficulty with his self-care.  Posturally, he can sit comfortably for 10 minutes in an hour, stand comfortably for 10-15 minutes in an hour, and notes difficulty with walking greater than 5-10 minutes.  He notes sleep difficulties.  He notes difficulty with climbing stairs.  He notes repetitive bending, twisting and lifting will exacerbate the pain.  He notes difficulty with driving.

A.R. 520.  Dr. Becan noted that an EMG/nerve conduction study of Plaintiff's lower extremities

had been performed on July 19, 2013 and that it was normal and showed no evidence of

lumbosacral radiculopathy.  A.R. 520, 522.  Dr. Becan's physical examination provided as follows:

> The claimant is noted to ambulate with a guarded and antalgic gait pattern.  There is weakness with toe walking on the left as compared to the right.
>
> Examination of the lumbar spine reveals posterior midline tenderness extending from L3 to S1.  There is bilateral paravertebral muscle spasm and tenderness extending from L3 to S1.  There is bilateral iliolumbar ligament tenderness.  There is no sacroiliac joint tenderness. Sitting root sign is to 60 degrees on the left and 70 degrees on the right.  Straight leg raising in the supine position is to 60 degrees on the right and 50 degrees on the left.  Range of motion testing reveals forward flexion of 40/80 degrees, backward extension of 10/30 degrees, left lateral flexion of 15/30 degrees, right lateral flexion of 15/30 degrees, left rotation of 15/30 degrees, and right rotation of 15/30 degrees.  Extremes of motion cause low back pain.  Further attempts of motion cause severe low back pain.
>
> Manual muscle strength testing of the lower extremities reveals the quadriceps[] and hamstrings are graded at 5/5 bilaterally, gastrocnemius is graded at 5/5 on the right and 4/5 on the left, and extensor hallucis longus muscles are graded at 5/5 on the right and 3/5 on the left.
>
> . . . .
>
> Sensory exam reveals no definitive sensory loss involving the lower extremities
>
> Ankle jerk reflexes reveal a decrease of the left ankle jerk reflex as compared to the right.

A.R. 521-22.  Dr. Becan provided the following diagnoses:

1.     Chronic post-traumatic lumbosacral strain and sprain.
2.     Bulging L4-L5 and L5-S1 discs, confirmed by MRI.
3.     Lumbosacral radiculitis.
4.     Lumbosacral myofascitis.
5.     Herniated L5-S1 disc.
6.     Bulging L3-L4 disc.
7.     Right sided lumbrosacral radiculopathy.
8.     Status post interventional pain management with epidural steroid injections, lumbar spine.

A.R. 522.  Dr. Becan concluded that Plaintiff has "multilevel disc abnormalities at L3-L4, L4-L5, and L5-S1," and that Plaintiff "has had an intractable debilitating low back pain for several years and has failed to respond to conservative treatment to date."  A.R. 524.  Accordingly, Dr. Becan opined that Plaintiff is a "strong candidate for a lumbar laminectomy and spinal fusion" once the pain generator is accurately identified, which he noted had failed to have been accomplished by a previous EMG/nerve conduction study.  A.R. 524.

### B.     Review of Disability Determinations

On  January 24, 2011, Plaintiff applied for social security disability insurance benefits, alleging disability beginning on August 18, 2008.  A.R. 228-30.  On June 8, 2011, the Social Security Administration denied Plaintiff's claim for disability benefits.  A.R. 135-40.  The Social Security Administration noted the following factors in reaching its decision:

- While you may still experience some pain in your lower back and shoulder areas[] there is no severe muscle weakness or loss of feeling in your limbs.  You are able to stand[,] sit and move about well enough to work.  You have some limitation in your ability to reach due to your shoulder impairments.  However, this does not preclude you from working also.

- The evidence shows no other condition which significantly limits your ability to work.

- We realize your condition prevents you from doing your usual work; however it does not prevent you from doing other types of work.

A.R. 135-36.

13

On January 10, 2012, the Social Security Administration denied Plaintiff's request for reconsideration, finding that its previous decision was proper under the law.  A.R. 143-48.  In reaching this decision, the Administration noted that it considered:

- You do have pain.  However, it does not limit your ability to move about and use your limbs.

- While you still experience some pain in your back, there is no severe muscle weakness or loss of feeling in your arms, shoulders or legs.

- The evidence shows no other condition which significantly limits your ability to work.

- Although you are not able to do any of the work you have done during the past 15 years, there are other kinds of work you should be able to do.

A.R. 143.

### C.    Review of Testimonial Record

#### 1.    Plaintiff's Testimony at the First Hearing.

Plaintiff testified that he was born on August 12, 1966, and that he had graduated high school, after which he attended a trade school at Woodland High School for electronics, which Plaintiff described as "[j]ust like house wiring, generators and stuff."  A.R. 29-30.  Plaintiff stated he did not do an apprenticeship or become a certified journeyman electrician.  A.R. 30.  Plaintiff also described his position(s) at Penn Jersey Advanced in the departments of insert control, delivery, collections, and as a messenger, including the time periods he worked at those positions, the lifting and driving requirements, and whether they required use of a computer.  A.R. 31-33.

Plaintiff described his typical day as waking up at 4 a.m. and sitting in a chair to watch TV until 9 a.m.  A.R. 43.  He stated that his chair is a recliner and that "[it]'s the only thing that gives [him] relief from [his] back sometimes[,] to lay in a chair like that, that goes back."  A.R. 43.  After watching TV, Plaintiff said that he prepares himself food and cleans himself in the bathroom, but

14

that his typical day involves "[n]ot much, there's nothing I really do during the day, . . . [I] move around constantly . . . [to] deal with the pain all day.  Sit, stand, walk, lay down a little bit."  A.R. 44.  Plaintiff stated that he cannot use a bathtub, and usually showers.  A.R. 58.

Plaintiff stated he is still able to drive "just around locally" to go "food shopping or something like that" by himself on days when he feels well enough to do so.  A.R. 44.  Plaintiff testified that his attorney drove him to the hearing, which took approximately 45 minutes.  A.R. 42-43.  Plaintiff does not carry his groceries, but uses a folding shopping cart, which he is able to load and unload himself; he estimated that his grocery bags usually weigh about five pounds and that he purchases milk in the half gallon and quart sized containers.  A.R. 45.  Plaintiff stated he cannot vacuum because of the pain in his back, and the last time he vacuumed was two years before the hearing; at that time, when he did try to vacuum he felt pain in his back, lower back, and leg.  A.R. 45-46.

Plaintiff testified that his home is a ranch-style house, A.R. 43, and that he has a yard and garden which he previously cared for himself, prior to 2008, but is now maintained by another person.  A.R. 46.  Plaintiff stated that he lives with his mother.  A.R. 48.  Plaintiff no longer goes to the movies nor does he have any hobbies; he reads the newspaper and works on the computer "[v]ery little," which he described as "[m]aybe every three days, for maybe a half hour."  A.R. 46-48.  Plaintiff stated that he stands when using his computer.  A.R. 48.

Plaintiff stated the reason he went back to Dr. Dwyer in September 2011 was because his right leg gave out on him while he was shopping.  A.R. 58-59.  As Plaintiff described:

> I went back to Dr. Dwyer because I started in, I guess, earlier in the year, my leg went totally numb when I was walking.  And I collapsed.  And then it started progressing worse where it would get numb more often.  And I'd always have pain going down the leg a lot more than I did . . . [f]rom my lower back, in my buttocks area.

A.R. 35.  Plaintiff stated that Dr. Dwyer recommended an EMG in November 2011 and May of 2012, but that Plaintiff had not undergone the procedure because it had not been approved by his Workers' Compensation carrier.  A.R. 36.  Similarly, Plaintiff stated he had not undergone a discography recommended by Dr. Dwyer because he was waiting for approval through his Workers' Compensation carrier.  A.R. 40.  Plaintiff also acknowledged that his doctors have recommended surgery based on the outcome of other tests, but testified that he was unsure whether he would undergo the recommended surgery.  As he explained:  "At the time, right now, I don't know what way I want to go with it because of what I hear with the doctors – the surgery.  I don't, you know – it's a coin toss.  So you know, I'm really skeptical of wind[ing] up being more crippled, or being better."  A.R. 47.

Plaintiff testified that he had not looked for work since September 26, 2011, although he had applied to two jobs back in 2010 that were offered to him, but that he could not obtain these jobs because he had failed their physical exam requirements.  A.R. 40-41.  When presented with a hypothetical job by the ALJ, which would allow him to alternate between sitting and standing, and did not require him to lift more than 10 pounds, Plaintiff replied that he could only perform that job if he could also sleep at night.  A.R. 48-49.  As Plaintiff explained:

> If I could sleep at night, and not be up all night tossing and turning with pain.  I get no sleep at night hardly, I'm up four o'clock, in the morning at times, and like two o'clock, in the morning.  I sleep for an hour and I'll wake up in pain.  I sleep for two hours, I wake up in pain.  I'm exhausted all day because of that.  I go to sleep all different times during the day because I'm in pain.

A.R. 49.  Plaintiff testified that the pain feels  is like "a cantaloupe" in his lower back, with pain going up and down his legs, numbness in his legs, and that "[w]hen the weather's horrible out, when it's going to rain, [he is] in so much pain.  [He] feel[s] crippled up."  A.R. 51.

16

Plaintiff testified that he had tried over-the-counter sleeping aids, but only painkillers actually help him sleep.  A.R. 50-51.  Plaintiff testified that one dose of Tylenol will give him relief for two hours, so that he can accomplish his chores during the day, and that he takes Percocet at night because it gives him a longer period of relief, up to 4 hours.  A.R. 34, 54, 56-57.  However, Plaintiff stated that he does not like the way he feels on these medications.  As he explained:  "I feel like a zombie.  You know, I don't like to walk around with my head clouded, feeling like . . . you're not focused on what you're doing.  I don't like feelings like that."  A.R. 55.  Plaintiff testified that he could take more pain medication to fill the additional time that he is in pain during the day, but that he does not like to because it makes him groggy and "dopey" and affects his ability to drive or do chores that involve manual dexterity, like using a kitchen knife.  A.R. 59-62, 64.

Plaintiff asserted that his medication would adversely affect his ability to do simple, routine jobs, A.R. 62-64, that he cannot go an eight hour time period without nodding off, and estimated that longest time period that he has gone without nodding off since September 2011 is five hours. A.R. 51.

Plaintiff estimated that he could sit for 30-45 minutes, although he also stated there are times when he cannot sit for more than 10 minutes.  A.R. 52, 57.  Plaintiff stated he would have to stand for "[m]aybe five minutes," before sitting down again, explaining that he "stand[s] to relieve the pain going down the leg," and that sometimes he has to "walk a little to relieve the pain."  A.R. 53, 58.  Plaintiff also stated that he cannot walk like he could previously due to his injury.  As he explained:

> I used to be able to walk a mile, two miles, walk around.  [Now] I'm lucky [if] I can walk a block, you know, without -- when the pain comes, then I worry about the leg going number and falling -- . . . that's why I carry a cane with me once in awhile when I have to walk far.

17

A.R. 53.  Plaintiff described his leg pain as "go[ing] all the way down to the ankle . . . [a]nd then radiat[ing] back up."  A.R. 58.  Plaintiff also stated that he can only turn his spine "a little bit and [then he] feel[s] the pain right away, in the back and the leg."  A.R. 58.

## 2.      Plaintiff's Testimony at the Supplemental Hearing

At the second hearing, Plaintiff testified briefly about his previous work with a computer. Plaintiff stated that he worked with a computer when he managed inserts for the newspaper he worked for, for a period of two months.  A.R. 69-70.  As Plaintiff explained:  "It varied day to day because you were on it more when you had to get documents out for the beginning of the week so they knew what inserts were going into the papers.  And just randomly through the week when inserts came in, you'd be on the computer."  A.R. 70.  When he was managing the inserts, Plaintiff estimated he had to lift 50-60 pound boxes, and 10-100 pounds boxes when he was in his messenger position.  A.R. 71.  Plaintiff testified that he had not performed any work since the first hearing.  A.R.  87.

## 3.      Testimony of the Vocational Expert

As noted above, on April 15, 2013, the VE completed the Vocational Interrogatory and provided the following answers to the four hypotheticals posed by the ALJ.  A.R. 332-42.

The first hypothetical provided:

Assume a hypothetical individual who was born on August 12, 1966, has at least a high school education and is able to communicate in English . . . , and has work experience as described in your response to question #6 [within the past 15 years]. Assume further that this individual has the residual functional capacity (RFC) to perform light work . . .  and is only occasionally required to climb[] stairs or ramps, stoop, bend, crouch and never crawl or climb ladders or scaffolds. . . . Could the individual described [above] perform any of the claimant's past jobs as actually performed by the claimant or as normally performed in the national economy?

A.R. 333.   The VE answered:  "Given the parameters of the first hypothetical the occupation of Courier would be appropriate given the definition in the Dictionary of Occupational Titles (DOT) but not as it was performed as described in the records reviewed."  A.R. 340.

> The second hypothetical provided:
>
> Assume a hypothetical individual who was born on August 12, 1966, has at least a high school education and is able to communicate in English . . . , and has work experience as described in your response to question #6 [within the past 15 years]. Assume further that this individual has the residual functional capacity (RFC) to perform light work . . . except, the claimant may, in their discretion, while remaining on task, alternate between a seated and standing position, and only occasionally be required to climb stairs or ramps, stoop, bend[,] or crouch and never be required to crawl or climb ladders or scaffolds. . . . Could the individual described [above] perform any of the claimant's past jobs as actually performed by the claimant or as normally performed in the national economy?

A.R. 335.   The VE answered:  "Given this hypothetical he would not be able to perform past relevant work either as it is described in the DOT or as performed.  The occupation of Courier in my experience does allow change in position in the course of performing work but the need to change position 'at will' is likely to impact productivity demands."  A.R. 340.  The VE provided three employment options in response to this hypothetical that the individual could perform: Cashier II, DOT # 211.462-010; Information Clerk, DOT # 237.367-018; and Storage Facility Rental Clerk, DOT # 295.367-026.  A.R. 341.  The VE also noted "[t]he DOT does not specifically address sit/stand options," and that his opinion was "based on experience."  A.R. 341.

> The third hypothetical provided:
>
> Assume a hypothetical individual who was born on August 12, 1966, has at least a high school education and is able to communicate in English . . . , and has work experience as described in your response to question #6 [within the past 15 years]. Assume further that this individual has the residual functional capacity (RFC) to perform sedentary work . . .  and is only occasionally required to climb[] stairs or ramps, stoop, bend, crouch and never crawl or climb ladders or scaffolds. . . . Could

the individual described [above] perform any of the claimant's past jobs as actually
performed by the claimant or as normally performed in the national economy?

A.R. 336.  The VE answered:  "Given this hypothetical he would not be able to perform past

relevant work either as it is described in the DOT or as performed as it exceeds the exertional

demands of past work."  A.R. 341.  The VE provided three employment options in response to this

hypothetical that the individual could perform:  Document Preparer, DOT # 249.587-018; Order

Clerk, DOT # 209.567-014; and Table Worker, DOT # 739.687-182.  A.R. 341.

> The fourth hypothetical provided:
>
> Assume a hypothetical individual who was born on August 12, 1966, has at least a
> high school education and is able to communicate in English . . . , and has work
> experience as described in your response to question #6 [within the past 15 years].
> Assume further that this individual has the residual functional capacity (RFC) to
> perform sedentary work . . . except, the claimant may, in their discretion, while
> remaining on task, alternate between a seated and standing position, and only
> occasionally be required to climb stairs or ramps, stoop, bend[,] or crouch and never
> be required to crawl or climb ladders or scaffolds. . . . Could the individual
> described [above] perform any of the claimant's past jobs as actually performed by
> the claimant or as normally performed in the national economy?

A.R. 338.  The VE answered:  "Employment Option same as Hypothetical #3," and again noted

that "[t]he DOT does not specifically address sit/stand options," and that his opinion was "based

on experience."  A.R. 342.

VE Jackie Wilson testified at the supplemental hearing.  The VE acknowledged that he had

listed two positions in which Plaintiff could work, as a courier, DOT # 230.663-010, and inserter

promotional item, DOT # 920.587-018, and that he did not need to modify his recommendation to

add additional jobs.  A.R. 71-72.

Plaintiff's counsel proposed adding three limitations to the hypotheticals previously given

to the VE.  First, Plaintiff's counsel asked whether the VE would change his opinion if the

hypothetical individual (in any of the hypotheticals) required unscheduled absences "maybe three

20

times a month." A.R. 72.  The VE testified that this limitation would preclude work.   A.R. 72.  Second, Plaintiff's counsel asked whether the VE would change his opinion if the hypothetical individual (in any of the hypotheticals) required unscheduled breaks of varying duration throughout the work day, three times during the workday, from 10-20 minutes at a time.  A.R. 72-73.  The VE testified that this limitation would also preclude work.  A.R. 73.  Finally, Plaintiff's counsel also proposed modifying the second hypothetical presented to the VE by the ALJ in the Vocational Interrogatory to include that the hypothetical individual would be incapable of occasional stooping, bending, and crouching.  A.R. 73-74.  The VE testified that such an individual would still be able to perform the sedentary occupations he identified, but not the jobs which required light work.  A.R. 73-74.

The VE acknowledged that the exertional level for occupations listed in the Dictionary of Occupational Titles does vary based on the establishment the person works in, and explained that the exertional level is "a framework" insofar as work can "vary from site to site but it could be up to that [level of exertion], but it doesn't mean that [the level of exertion] has to be that."  A.R. 74-76.

The VE further acknowledged that the DOT does not address the ability to sit or stand option, and that evidence about the sit or stand option was based on his experience, and that that for certain jobs, the ability to sit or stand is "dictated by the work process."  A.R. 76.  The VE testified that there are some "unskilled positions where people are able to manage the process sitting and standing," based on his experience, and that in skilled work, there is a "greater opportunity" for the person to control the amount of time they spent sitting and standing.  A.R. 77.  The VE testified that, based on his experience, the jobs he identified had sufficient control over the process to be able to exercise the sit stand option at will.  77.

The VE testified that, for the jobs he identified, the maximum break periods were as follows:

> [T]he standard is there's a 15 minute break in the morning, there's a half an hour lunch and 15 minutes in the afternoon. My opinion is that people -- you know, five or six minutes, up to -- when you start to get to 10 minutes, when you're away from the, you know, workplace, and to me, that's going to really affect productivity. So that's not acceptable.

A.R. 78. The VE testified that for the light jobs he identified, the employer "by and large" has to provide a chair or stool, and that the employee would not bring his own chair, although the VE testified that he has known of people bringing their own chairs to work. A.R. 79-80. The VE stated that he could not estimate the percentage of jobs he identified where stools or chairs would be provided to the Plaintiff. A.R. 80-81.

The VE testified that his sources for the number positions in the occupations that he identified in the regional economy as:

> I used the resources that I use. It's based on the Department of Labor Data. But I use a software program called Skill-Tran, and also U.S. publishing. And they have -- they provide the regional numbers. The region I'm using is the metropolitan New York, northern New Jersey [region]. And they're -- those are two of the standard ways to estimate jobs nationally and regionally within my profession.

A.R. 82-83, 84. The VE stated that U.S. Publishing used census data from the first quarter of 2012, and that Skill-Tran's census data is from May 2012. A.R. 83-84. The VE testified that he did not conduct any labor market surveys herself. A.R$. 84. The VE conceded that he did not know how many jobs total there were in the New York/northern New Jersey region, nor how many people lived within that region. A.R. 85-86.

**D.    ALJ's Findings**

The ALJ issued a written decision on December 26, 2013.  A.R. 13-24.  The ALJ began by finding that Plaintiff met the insured status requirement of the Social Security Act to remain insured through December 31, 2014.  A.R. 13, 15.  Next, the ALJ applied the standard five-step process to determine if Plaintiff had satisfied his burden of establishing disability.

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 26, 2011, the alleged onset date.  A.R. 15.

Second, the ALJ found that Plaintiff had the following severe impairments: "disorders of the back (20 CFR 404.1520(c) and 416.920(c))."  A.R. 15.

Third, the ALJ found that Plaintiff did not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments under the Act that would qualify for disability benefits.  A.R. 15-16.  In this step, the ALJ considered section 1.04 (Disorders of the spine).  Specifically, the ALJ found "[t]he claimant's back disorder does not rise to the level of meeting the spinal stenosis, nerve root, or spinal cord compression requirements of medical listing 1.04 (with the attendant sensory or reflex loss, spinal arachnoiditis or pseudoclaudication), and is not supported by the necessary diagnostic and clinical evidence."  A.R. 15-16.

Fourth, the ALJ found that Plaintiff had the residual functional capacity to perform the exertional demands of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), A.R. 16, with the exception that "[t]he claimant[] must be afforded the option of changing from a standing to a sitting position on an as-needed basis; can only occasionally climb stairs and ramps; can only occasionally stoop, bend, and crouch; and is precluded from crawling or climbing ladders or scaffolds."  A.R. 16.  In reaching this RFC determination, the ALJ extensively reviewed

Plaintiff's statements concerning his physical condition, as well as his medical records concerning his alleged impairments.  *See* A.R. 16-17.

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]"  A.R. 17. The ALJ recounted that Plaintiff was cleared to perform heavy work after treatment with medication, physical therapy, and epidural injections, and that Plaintiff reported in February of 2009 that he felt he has "significantly improved" and that his back felt better, and that an MRI from September 2008 indicated lumbar degenerative disc changes and mild diffuse bulging, but no evidence of stenoses, herniation, or nerve root involvement.  A.R. 16.

The ALJ also noted that Plaintiff's amended alleged onset date was supported by the fact that Plaintiff did not seek additional medical treatment until September 16, 2011, and that Plaintiff did not undergo a recommended EMG at that time, ostensibly due to a lack of insurance.  A.R. 16. Although Plaintiff complained of lower back pain, radicular symptoms, and pain with sitting, standing, and walking, the ALJ noted that his MRI showed no evidence of nerve root involvement (although it did show herniations at L4 and S1).  A.R. 16-17.  The ALJ further explained:

> Significantly, findings from an examining physician credibly include evidence that the claimant is overstating the severity of the symptoms.  In addition, the claimant reported that his pain was alleviated with pain medications and rest. The examination did credibly indicate that the claimant has decreased sensation in multiple dermatomes supporting some degree of lower extremity radiculopathies. However, there was no abnormal asymmetry in the claimant's deep tendon reflexes, his leg raise results were inconsistent, and the claimant was positive for 3 out of 5 Waddell signs, "making it difficult to you to interpret what is truly organic versus symptom magnification."   Once more, the claimant was advised to undergo electrodiagnostic testing in the form of EMG and nerve studies to assess whether there is objective evidence of a right lumbosacral radiculopathy.
>
> The claimant's report during a medical examination performed in furtherance of his disability application is consistent with prior statements that the

claimant can sit or stand for only 15 to 30 minutes at a time.  The examination deferred rating the claimant's limitations until the claimant underwent a discogram and EMG and nerve conduction studies.  It should be noted that the claimant sat through the hearing without alternating sitting or standing, for 55 minutes.

Moreover, the consultative medical examiner's findings are corroborative of these treatment and examination findings at best supporting the residual functional capacity found here.

A.R. 17 (citations omitted).  As the ALJ explained when he summed up his reasoning:

I find that the unchanged nature of the MRI evidence, the inconsistent response to the straight leg raising test, the general lack of credible clinical examination findings supporting the degree of impairment undermines the claimant's credibility. In addition, . . .  the claimant's lack of undertaking an EMG test also detracts from the credibility of his alleged symptomology.

A.R. 17.

Fifth, the ALJ found that, although Plaintiff was unable to perform his past relevant work, A.R. 18, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity,[7] "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  A.R. 18-19.  In reaching this determination, the ALJ relied on the testimony of a vocational expert that an individual with Plaintiff's age, education, past relevant work experience, and residual functional capacity could perform the following representative occupations:  "document preparer (DOT 249.587.018), with 98,860 jobs in the national economy; order clerk (DOT 209.567-014) with 19,105 jobs in the national economy; and table worker (DOT739.687-182) with 13,408 jobs in the national economy."  A.R. 18.

---

[7] The ALJ found that (1) Plaintiff was 45 years old on the date of the alleged onset of disability; (2) Plaintiff has "a limited education and is able to communicate in English"; and (3) the transferability of job skills was "not material" to the determination of disability because "the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills."  A.R. 18.

Accordingly, the ALJ concluded that "the claimant was not under a disability, as defined in the Social Security Act, from September 26, 2011, through the date of this decision," and denied Plaintiff's claims for disability benefits and supplemental security income  A.R. 19.

## II.   STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record."  42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate."  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993).  Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence.  *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching,

carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy."

*Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520(f).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled.  Id.

## III.    PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff makes three arguments on appeal as to why the ALJ's disability determinations were not supported by substantial evidence.  First, Plaintiff argues that the ALJ's hypotheticals to the VE failed to include, or specifically identify, all of his impairments.  Second, Plaintiff argues the ALJ failed to inquire about any inconsistencies between the VE's testimony and the DOT.  Third, Plaintiff argues the ALJ failed to consider additional statistical information Plainitff submitted after the supplemental hearing which Plaintiff contends casts doubt on the VE's testimony concerning the number of unskilled sedentary occupations in the regional and national economies.  The Court shall address each argument in turn.

### A.    The ALJ's Hypotheticals Properly included Plaintiff's Medically Established Limitations.

First, Plaintiff argues this matter must be remanded because the ALJ "failed to convey in his hypothetical questions to the vocational expert all of claimant's impairments that were supported by the record."  Pl. Br. at 12.  Specifically, Plaintiff claims that (1) the ALJ's hypotheticals did not include "Plaintiff's testimony regarding the side effects of his pain medications that made him sleepy during the work day along with his testimony that [Plaintiff] became unfocused from the medications thereby raising issues concerning Plaintiff's ability to maintain concentration, persistence or pace," *id.*, and (2) the ALJ's hypothetical questions concerning the discretionary sit-stand election were defective because "[t]his ambiguous work accommodation is contrary to Social Security Ruling 96-9p which states the RFC 'assessment

29

must be specific as to the frequency of the individual's need to alternate between sitting and standing.'" *Id.* at 13.

Plaintiff's claim that the ALJ should have included Plaintiff's claims regarding the side effects of his pain medication in the hypotheticals presented to the VE is unavailing. An ALJ is not required to submit every impairment *alleged* by a claimant to the VE; instead, the "hypotheticals posed must 'accurately portray' the claimant's impairments and . . . the expert must be given an opportunity to evaluate those impairments 'as contained in the record.'" *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). "Fairly understood," the requirement that "all impairments" be presented to the VE "encompass[es] only those [impairments] that are medically established. And that in turn means that the ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*." *Id.* (citations and footnote omitted) (emphasis in original).

A limitation is "credibly established" if it is supported by medical evidence and otherwise undisputed by the record. *Id.* "The effect of medication on a claimant's ability to work will be considered if it 'can reasonably be accepted as consistent with the objective medical evidence.'" *Schmidt v. Comm'r Soc. Sec.*, 465 F. App'x. 193, 198 (3d Cir. 2012) (quoting 20 C.F.R. § 404.1529(c)(3)). "Factors that will be considered include the 'type, dosage, effectiveness, and side effects' of any medication. When assessing the credibility of a claimant's testimony, the adjudicator must consider any subjective effects of medication." Id. (citations omitted).

Here, although Plaintiff testified that his medications caused drowsiness and clouded his mental focus, *see* A.R. 51, 55, 59-64, the medical record is devoid of any evidence to support these assertions. After September 26, 2011, the alleged onset date, none of Plaintiff's medical providers made any note that Plaintiff's medications were causing him drowsiness or clouding his mental

focus.  A.R. 115-18, 481, 502-07, 508-18, 519-27.  For example, when Plaintiff was examined on May 7, 2012, he told the physician he was taking Tylenol #4, but there is no record of him indicating that he was experiencing drowsines or other side effects at this visit.  *See* A.R. 502-07.  Similarly, when Plaintiff was examined on February 1, 2013, in connection with his workers' compensation claim, Plaintiff told the physician he was taking pain killers, including Tylenol # 4 and Percocet, but the record does not indicate he complained of drowsiness or other side effects from those medications.  *See* A.R. 508-18.

The Third Circuit has previously held that where, as here, an ALJ fails to provide "'any explanation for his implicit rejection of [the claimant's] testimony regarding the effects of the medication he took,' it is unclear whether such testimony is 'not credited or simply ignored.'" *Schmidt v. Comm'r Soc. Sec.*, 465 F. App'x. 193, 199 (3d Cir. 2012) (quoting *Stewart v. Secretary of Health, Ed. and Welfare of U.S.*, 714 F.2d 287, 290 (3d Cir. 1983)).  "The ALJ is required to include reasoning for rejecting any relevant evidence, and where no reasoning is provided, we generally remand for the ALJ to consider the impact of the medication side effects on the claimant's disability status" *Id.*  Nevertheless, reversal is not required – even when the ALJ does not provide an explanation for rejecting a claimant's testimony regarding the side effects of medication – where, as here, "the only probative evidence is the claimant's own conclusory statements," which "are not consistent with the medical evidence in the record."  *Id.* at 199.  Moreover, the Third Circuit has "previously observed that 'drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations." *Rutherford*, 399 F.3d at 555 (quoting *Burns v. Barnhart*, 312 F.3d 113, 126 (3d Cir. 2002)).  As in *Rutherford*, Plaintiff here has failed to present "evidence of any functional limitation" related to his alleged drowsiness and clouded mental focus and, therefore, the ALJ's implicit decision to

31

discount these claimed side-effects is supported by substantial evidence.  *Id.*; *see also Grandillo v. Barnhart*, 105 F. App'x. 415, 419 (3d Cir. 2004) ("In sum, Grandillo has not cited to any medical evidence demonstrating that she suffered adverse side effects from her medication.  Further, her own conclusory statements would not establish a sufficient ongoing struggle with any side-effects to undermine the ALJ's determination.  The ALJ's failure to take into account the side-effects of Grandillo's medication was not error.").

Second, Plaintiff's argument that the hypotheticals that the ALJ gave to the VE were defective because they are contrary to SSR 96-9p also fails.  Social Security Ruling (SSR) 96-9p provides, in relevant part, that "[t]he RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.  It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work." SSR 96-9p, 1996 WL 374185, at *7.

The hypotheticals at issue in this case assumed that the person would, at his or her discretion, "alternate between a standing and sitting position." A.R. 335, 338.  Several courts in this Circuit have found RFCs with similar levels of specificity as to the frequency of a claimant's need to alternate between sitting and standing at will have satisfied the requirement of SSR 96-9p, even though those RFCs did not specifically delineate the exact amount of time a claimant would need to switch between sitting and standing.  *See e.g.*, *Swarrow v. Colvin*, No. 13-1060, 2014 U.S. Dist. LEXIS 94960, at *36 (W.D. Pa. July 14, 2014) (finding hypothetical with need to "alternate between sitting and standing at will throughout the workday" sufficient); *McGinnis v. Comm'r of Soc. Sec.*, No. 12-1395, 2013 U.S. Dist. LEXIS 177178, at *33 (W.D. Pa. Dec. 18, 2013) (finding hypothetical with need for "an option to sit or stand at will" sufficient); *Joyce v. Comm'r of Soc. Sec.*, No. 11-6441, 2012 U.S. Dist. LEXIS 181768, at *13 (D.N.J. Dec. 26, 2012) (finding

hypothetical with need for "the inclusion of a sit/stand option" sufficient).  Here, the ALJ received

testimony from a vocational expert, who opined that a hypothetical individual with Plaintiff's RFC,

age, education, and vocational experience could perform jobs that existed in significant numbers

in the regional and national economy that were sedentary in exertion with an option to sit or stand

at will.  The vocational expert explained that the jobs he listed could be accomplished while either

sitting or standing, which, given the process of those jobs, would be within Plaintiff's discretion.

A.R. 77.  Accordingly, the ALJ's assessment of Plaintiff's RFC did not lack the specificity required

in Ruling 96-9p.

### B.        The ALJ Properly Complied with SSR 00-4p.

Second, Plaintiff argues that the ALJ failed to "resolve the [c]onflicts between the

Vocational Expert's testimony and the information supplied by the DOT."  Pl. Br. at 13.

Specifically, Plaintiff argues that the ALJ "failed to inquire about any inconsistencies and simply

accepted the vocational expert's testimony based on [his] professional experience . . . . contrary to

SSR 00-4p."  This argument lacks merit.

Social Security Ruling 00-4p requires the ALJ to ask the VE whether any possible conflict

exists between his or her testimony and the DOT and, if the testimony does appear to conflict with

the DOT, the ALJ must 'elicit a reasonable explanation for the apparent conflict.'"  *Burns*, 312

F.3d at 127 (quoting SSR 00-4p).  Complying with SSR 00-4p, the ALJ did in fact ask the VE

after each hypothetical in the Vocational Interrogatory if there were any "conflicts between the

occupational evidence" that the VE provided for each answer "and the occupational information

contained in the DOT and/or the [Selected Characteristics of Occupations][.]"  *See* A.R. 333-39.

The VE responded to each of these inquires by either stating that his findings were "consistent

with the DOT," or by explaining that "the DOT does not specifically address" the issue, such as

the sit/stand option, and explained that his assertions were "based on experience."  A.R. 341-42.

Based on this information, the ALJ stated in his decision that "although the vocational expert did

not testify that his testimony is consistent with the information contained in the Dictionary of

Occupational Titles, he credibly testified that his opinion in this regard was based on his

professional experience."  A.R. 18.

In short, as required by SSR 00-4p, the ALJ properly inquired about inconsistencies

between the VE's testimony and the DOT, and, where the VE responded that the DOT was not

consistent with his testimony, because the DOT did not address sit/stand options, the ALJ properly

elicited a reasonable explanation for the apparent conflict from the VE.

### C. Plaintiff's Statistical Evidence Failed to Contradict the VE's Testimony Concerning the Number of Jobs Available in the Regional and National Economies.

Finally, Plaintiff argues that after the supplemental hearing he submitted statistical

evidence to the ALJ which "rais[ed] doubt as to the vocational expert's testimony that there were

a significant number of unskilled sedentary jobs that the hypothetical individual could perform

based on the RFCs set forth in hypothetical questions 3 and 4."  Pl. Br. at 14.  Plaintiff argues the

ALJ had "an obligation to address the contentions raised by the statistical information provided as

it clearly raises questions as to whether the unskilled sedentary occupations identified by the

vocational expert are truly significant in either the regional or national economies."  *Id.* at 14.  This

argument is without merit.

Under the Act, a claimant is disabled only if his impairments are so severe that he cannot

do his previous work or, "engage in any other kind of substantial gainful work which exists in the

national economy."  42 U.S.C. § 423(d)(2)(A).  "[W]ork which exists in the national economy"

means "work which exists in significant numbers either in the region where such individual lives

or in several regions of the country." *Id.* "[I]n this connection, it is irrelevant whether 'such work exists in the immediate area in which (an individual) lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.'" *Santise v. Schweiker*, 676 F.2d 925, 926 (3d Cir. 1982) (quoting 42 U.S.C. § 423(d)(2)(A)).

This Court is unaware of any decision which has interpreted the term "significant numbers," as used in the Act, to require the number of jobs to be a large percentage of the overall number of jobs available, and Plaintiff provides no support for this argument. Indeed, the Third Circuit has found job quantities far smaller than the amount identified by the VE here – 131,373 unskilled sedentary jobs in the national economy and 8,361 in the regional economy, A.R. 342 – sufficient to satisfy the "significant numbers" requirement contained in 42 U.S.C. § 423(d)(2)(A). *See, e.g.*, *Ahmad v. Comm'r of Soc. Sec.*, 531 F. App'x. 275, 278 (3d Cir. 2013) (finding that the "ALJ did not err by concluding that the 569 jobs . . . [in the regional economy] was evidence of other work in significant numbers in the national economy"); *Craigie v. Bowen*, 835 F.2d 56, 57-58 (3d Cir. 1987) (finding that 200 jobs in the regional economy was an "indication that there exists in the national economy other substantial gainful work").

Even accepting – without so holding – that the ALJ was required to explicitly address (and reject) the supplemental statistical information provided by Plaintiff, such an error would clearly be harmless. The VE's testimony provided substantial evidence to support the ALJ's conclusion that there are a significant number of unskilled sedentary jobs in the national and regional economies that Plaintiff could perform, and the data Plaintiff provided failed to cast any doubt on the VE's testimony.

## IV.    CONCLUSION

For the reasons set forth above, I find that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed. An appropriate Order shall follow.

Dated: July 19, 2016

/s/ The Honorable Freda L. Wolfson

United States District Judge

36